UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RANDALL L. LEYMAN,

                Plaintiff,

v.                                                 Case No. 5:09-cv-46-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for a period of disability, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 14 & 15.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On April 1, 2004, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income,[1] alleging a disability onset date of March 22, 2004. (R. 74.) Plaintiff's application was denied initially and upon reconsideration. (R. 42-49.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 35.) The ALJ conducted Plaintiff's administrative hearing on February 15, 2007. (R. 688-702.) The ALJ issued a decision unfavorable to

---

[1] Although Plaintiff applied for disability insurance benefits, he is not appealing the Commissioner's decision as to these benefits.

Plaintiff on April 26, 2007. (R. 10-21.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 4-8.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[2] *See* 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, he is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[12] Fourth, if a claimant's impairments do not

---

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] Id. § 404.1520(c).

[12] Id. § 404.1520(d).

prevent him from doing past relevant work, he is not disabled.[13] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are

---

[13] 20 C.F.R. § 404.1520(e).

[14] Id. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

Id. (internal citations omitted).

[17] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty seven (47) years old at the time of the ALJ's decision on April 26, 2007. (R. 21, 74.) He has an eleventh grade education with no relevant work experience. (R. 69, 92.) Plaintiff contends that he has been unable to work since March 22, 2004 due to seizures, depression, and anxiety. (R. 39.)

In the ALJ's review of the record, including Plaintiff's testimony and medical records from several health care providers, the ALJ determined that Plaintiff suffers from a seizure disorder, a history of hepatitis C infection, an affective disorder, and a

---

[18](...continued)
grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[20] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[21] See id.

[22] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

personality disorder. (R. 15.) While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 15-18.)

The ALJ then found that Plaintiff retained the RFC to perform the exertional demands of all work except that Plaintiff is restricted from being on unprotected heights and near dangerous moving machinery. As for mental impairments, the ALJ found that Plaintiff's affective disorder and personality disorder have imposed mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace without repeated episodes of decompensation. (R. 18.) After finding that Plaintiff has no relevant past work experience, the ALJ applied Rule 204.00 of the Medical-Vocational Guidelines (the "grids")[23] as a "framework" and found that Plaintiff was not disabled. (R. 20.)

Plaintiff raises a variety of issues in his appeal which all pertain to the ALJ's assessment of Plaintiff's somatoform disorder.[24] The Court will limit its discussion of Plaintiff's medical records accordingly.

A review of all of the medical evidence of record reveals that Plaintiff's examining physicians referred to a potential diagnosis of "somatoform disorder" on only two

---

[23] 20 C.F.R. § 404, subpt. P, app. 2.

[24] Somatoform disorders are characterized by the presence of physical symptoms that either cannot be fully explained by a general medical condition or the physical complaints are "grossly in excess of what would be expected from the history, physical examination, or laboratory findings" thus suggesting there is a psychological component involved. *See Somatoform Disorders*, *in* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 485-511 (4th ed. 2000).

occasions. In June 2006, Dr. Christopher Sackellares, Plaintiff's treating neurologist at the VA since August 2005, referred Plaintiff to a neuropsychologist with a provisional diagnosis of "somatoform disorder" due to consistently benign clinical findings, normal diagnostic test results accompanied by Plaintiff's continued significant physical complaints. (R. 433.)

In October 2006, Plaintiff reported to Dr. Brian Shenal, another VA physician, for a neuropsychological evaluation. Dr. Shenal noted that Plaintiff "has a history of seizures which are thought to be non-epileptic and likely of a somatic psychogenic[25] nature." During his examination of Plaintiff, Dr. Shenal observed that Plaintiff was able to maintain appropriate concentration and attention, his speech and unassisted gait were normal, and Plaintiff was able to recall remote events accurately. Over the course of the examination, Plaintiff did not demonstrate inappropriate behavior, involuntary movements, or tremors. Dr. Shenal's overall impression was that Plaintiff appeared to "have variable effort and he may have over-endorsed his symptoms." In fact, due to his opinion that Plaintiff was intentionally attempting to "create a negative picture" of himself (possibly attributable to the associated potential for secondary gain), Dr. Shenal determined that the results of his MMPI testing were invalid. Dr. Shenal further opined that although "a true cognitive impairment cannot be fully ruled out," any attention and/or concentration deficits Plaintiff may be experiencing could be attributable to the medications he is taking. (R. 468-70.) None of Plaintiff's subsequent medical records

---

[25] Psychogenic is defined as "of mental origin or causation." STEDMAN'S MEDICAL DICTIONARY, *Psychogenic,* 1595 (28th ed. 2006).

refer to a somatoform disorder nor do any of the medical records of evidence show that Plaintiff was ever diagnosed with and/or treated for a somatoform disorder.

An EEG performed in June 2004 reveals that Plaintiff did suffer from epileptic seizures. (R. 191.) However, based upon his benign clinical findings and normal diagnostic testing results during his ongoing treatment of Plaintiff from August 2005 through March 2008, Dr. Sackellares confirmed that Plaintiff's epileptic seizures are well-controlled by medication and ultimately opined that Plaintiff's remaining subjective complaints of reported "seizure" activity were likely attributable to one of his medications. (R. 349, 352, 354-55, 359-60, 368-69, 391-92, 402, 421, 423, 425-26, 433-34, 474-75, 555-56, 588, 592-93.)

CT scans of Plaintiff's head performed in May 2005 and January 2007 were both normal. (R. 350, 502-03.) An EEG performed in February 2006 was normal. (R. 576.) Plaintiff subsequently underwent a long term EEG in early 2006 which continuously monitored Plaintiff's brain activity over the course of several days. Despite Plaintiff's complaints of having frequent "seizures" during this monitoring, the EEG revealed no abnormalities. (R. 436.) A four day EEG with video monitoring was performed in April 2007. The video showed several episodes of tremors and "jerking" events unaccompanied by epileptic activity in the EEG. When Plaintiff's medications were adjusted during this monitoring, his condition improved. (R. 526-28.)

After reviewing video EEG results, Plaintiff's treating neurologist opined that Plaintiff's reported symptoms – described as "seizures" – were probably attributable to one of his medications. Plaintiff sought a second opinion from another neurologist who

8

reviewed Plaintiff's medical records and examined Plaintiff. Neurological examination of Plaintiff was normal except that he noted that Plaintiff was mildly unsteady. The neurologist agreed with Dr. Sackellares' assessment that Plaintiff's reported physical symptoms were likely attributable to Plaintiff's medication. (R. 580-81.) Dr. Sackellares' opinion is further bolstered by medical evidence associated with Plaintiff's hospitalization in January 2006 for complaints of abdominal pain. Despite Plaintiff's reports that he normally experiences several "petit" seizures on a daily basis, no seizure activity was observed at any point during his three day hospital stay. (R. 397-426.)

The medical evidence of record reflects that the only functional limitations any physician has placed on Plaintiff in connection with his seizure disorder are as follows: no driving, no bathing alone, no climbing of ladders, avoid working at unprotected heights, and no use of power tools or heavy machinery. (R. 309.) Consistent with these limitations, two non-examining state agency physicians, who each reviewed Plaintiff's medical records, opined that he had no exertional limitations, but was limited in his ability to climb of ladders, rope or scaffolds, and he should avoid hazards (machinery, heights, etc.). (R. 212-20, 301-08.)

In September 2004, Plaintiff reported to Dr. Ken Ng, a neurologist, for consultative examination pursuant to the request of the Social Security Administration. Dr. Ng reviewed Plaintiff's June 2004 diagnostic test results and noted that his neurological examination of Plaintiff was unremarkable. (R. 209-10.) A second consultative examination was performed in January 2005 by Dr. Dantuluri Raju. Dr. Raju noted Plaintiff's history of seizures and subjective complaints of having seizures on

a daily basis. Dr. Raju's examination of Plaintiff was unremarkable and he opined that Plaintiff "presented as normal, intact and exhibit[ed] no evidence of any condition that would suggest functional loss . . . [and Plaintiff] did not appear to be dulled, mentally slowed or diminished" during the examination. (R. 279-82, 285.)

With respect to Plaintiff's mental health, Plaintiff has a history of depression and anxiety for which he has sought mental health treatment at the VA since November 2005. (R. 371-76.) Plaintiff underwent two consultative examinations with Dr. Rodney Poetter for evaluation of his mental status. In June 2004, Plaintiff complained of having several seizures per month and that he does not like crowds. Plaintiff advised that his interests included woodworking, fishing, and spending time with his father and he reportedly was capable of independently performing all activities of daily living. Examination revealed normal speech, below average cognitive and academic skills with some evidence of depressive symptoms. During the examination, Plaintiff demonstrated moderate to severe deficits in immediate memory; however, Dr. Poetter noted that Plaintiff "performed mental control exercises quickly and without error, inconsistent with severe concentration deficits." Dr. Poetter diagnosed Plaintiff with depressive disorder NOS, and personality disorder NOS, with antisocial personality traits. (R. 161-63.) Plaintiff returned to Dr. Poetter for a second evaluation in January 2005. At that time, Plaintiff reported that his interests included playing yahtzee, and doing word search puzzles. Dr. Poetter did not observe any signs of coordination or balance deficits. Plaintiff's thought processes appeared coherent and lucid. Plaintiff demonstrated moderate deficits in immediate memory but performed simple mental exercises quickly

and without error, inconsistent with severe concentration deficits. Dr. Poetter's impression was that the ongoing litigation regarding Plaintiff's child support issues adversely affected his mood - but there was no evidence of any major affective or thought disturbance. He found no evidence of an underlying thought disorder and opined that Plaintiff's symptoms were suggestive of an adjustment disorder with depressed mood, and (rule out) borderline intellectual functioning. (R. 276-78.)

Plaintiff subjectively complained of an intermittently depressed mood, anxiety, and discomfort in crowds. His complaints of depression were usually directly associated with the loss of his mother. (R. 371-76.) His discomfort in crowds was associated with the embarrassment he experienced when he had seizures in public places. (R. 372.) Nonetheless, mental status examinations performed by Plaintiff's treating physicians between August 2004 and March 2008 occasionally revealed a depressed mood and/or anxious affect, but were otherwise consistently normal and demonstrated no evidence of any thought disorders or impairments. (R. 224, 371-76, 381, 390, 397, 404, 441-42, 464-65, 472, 491, 588-89, 602, 656-60.) In fact, by March 2008, Plaintiff's treating psychiatrist noted that Plaintiff's depressed mood was well controlled by his medications, and that Plaintiff reportedly felt better. (R. 588-89.)

A non-examining state agency physician reviewed Plaintiff's medical records regarding Plaintiff's mental health complaints in February 2005 and opined that Plaintiff did not suffer from a severe mental impairment. Specifically, he noted that Plaintiff "does not present with mental slowing and expected mild disorganization of someone who

actually has grand mal seizures regularly. . . mental limitations in functioning are minimal." (R. 286-98.)

## IV. **DISCUSSION**

Without any appreciable development of his arguments, Plaintiff raises several issues on appeal – all of which center on the ALJ's consideration of Plaintiff's alleged somatoform disorder.

As a threshold matter, no physician ever conclusively determined that Plaintiff, in fact, even suffers from a somatoform disorder. Indeed, the evidence suggests that Plaintiff does not. Nonetheless, Plaintiff does not point to any specific functional limitations associated with such a diagnosis that should have, but were not, included in the ALJ's assessment of Plaintiff's RFC. A mere diagnosis of a medical condition does not necessarily compel the conclusion that the condition is disabling.[26] The burden is on the Plaintiff to provide evidence demonstrating the disabling impact of his medical condition.[27] As such, in the absence of evidence of functional limitations attributable to the condition, a diagnosis of a condition is insufficient to support a finding of a severe impairment.[28]

---

[26] 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

[27] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[28] Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005); see also McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

In the instant matter, the ALJ found Plaintiff to have no exertional limitations. He limited Plaintiff to unskilled work that did not involve being on unprotected heights or near dangerous moving machinery. (R. 18.) This RFC is supported by substantial evidence. No treating or examining physician ever opined that Plaintiff had any functional limitations beyond those found by the ALJ. Although Plaintiff challenges the ALJ's treatment of medical evidence from Plaintiff's treating physicians, there is no indication that the ALJ gave the opinions of Plaintiff's treating physicians anything other than full weight. While the medical evidence of record documents Plaintiff's long history of seizure disorder, Plaintiff's treating neurologist opined that Plaintiff's epileptic seizures were well-controlled by his medications. None of the diagnostic testing performed between 2005 and 2007 revealed any abnormalities. The only functional limitations ever placed on Plaintiff by any of his treating physicians were incorporated into the ALJ's assessment of Plaintiff's RFC.

Further, with respect to Plaintiff's mental health, the ALJ concluded that Plaintiff had functional limitations in excess of those imposed by a non-examining state agency physician. While the non-examining state agency physician who performed the Psychiatric Review Technique opined that Plaintiff did not suffer from any severe mental impairments, the ALJ found Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace without repeated episodes of decompensation as a

13

result of an affective disorder and a personality disorder. (R. 18.) This is consistent with the ALJ's assessment that Plaintiff was limited to unskilled work.[29]

To the extent that Plaintiff argues that the ALJ committed reversible error by failing to fully develop the record, Plaintiff has failed to show how the record is inadequate. As discussed above, there is no evidence that Plaintiff was ever diagnosed with or treated for a somatoform disorder. Indeed, the neuropsychological examination performed at the request of Plaintiff's treating neurologist when Plaintiff's subjective complaints continued to exceed his objective findings was inconclusive and suggested that Plaintiff was intentionally attempting to cast himself in a negative light perhaps prompted by the potential for secondary gain. Plaintiff subsequently underwent a significant amount of medical treatment and none of the associated medical evidence refers to a somatoform disorder. As such, the ALJ had no obligation to either obtain a consultative examination or recontact Plaintiff's treating physicians for additional evidence because the record contained ample evidence upon which the ALJ could decide Plaintiff's case.[30]

Plaintiff also argues that the ALJ committed reversible error at step five of the sequential analysis because he failed to obtain testimony from a vocational expert. Because the ALJ determined that Plaintiff had no past relevant work experience, he proceeded to step five of the sequential analysis and, using Rule 204.00 as a

---

[29] In view of the fact that there is absolutely no medical evidence of any functional limitations beyond those already incorporated into the ALJ's assessment of Plaintiff's RFC, Plaintiff's argument that Plaintiff's Somatoform Disorder meets or equals the criteria of Impairment Listing 12.07, Somatoform Disorders, is without merit. *See* 20 C.F.R. § 404, subpt. P, app. 1, 12.07(B).

[30] Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 2001).

"framework", found Plaintiff was capable of performing work which exists in significant numbers in the national economy. "A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels."[31] Again, as discussed above, Plaintiff has failed to identify any non-exertional limitations which were not incorporated into Plaintiff's RFC. When a claimant's vocational characteristics coincide with the factors set forth in the "grids," the existence of jobs in the national economy is established and the Commissioner's burden at step five has been satisfied.[32]

Lastly, because the ALJ's determination that Plaintiff has not been under a disability at any point since the alleged date of onset of disability, the ALJ could not have erred by failing to comply with Social Security Ruling 83-20.[33]

---

[31] SSR 85-15p.

[32] *See* Phillips v. Barnhart, 357 F.3d 1232 (11th Cir. 2004) (citing Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996)).

[33] *See, e.g.*, Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997) ("Since there was no finding that the claimant is disabled as a result of his [impairments] . . . no inquiry into onset date is required.")

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g). The Clerk is directed to enter final judgment in favor of the Commissioner consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 5, 2010.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel